IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| WILLIAMS SCOTSMAN, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DRYADES YOUNG MEN'S )<br>CHRISTIAN ASSOCIATION, )<br>)<br>Defendant. ) | Civil Action No. 20-cv-00887-LKG<br><br>Dated:  December 18, 2023 |

**MEMORANDUM OPINION**

**I.     INTRODUCTION**

    This civil action arises out of the alleged breach of three lease agreements by and between Plaintiff, Williams Scotsman, Inc. ("Williams Scotsman") and Defendant, Dryades Young Men's Christian Association ("Dryades"), for the use of modular classroom units for an elementary school. *See generally*, ECF No. 77-1.  Williams Scotsman has moved for summary judgment on its breach of contract claims, pursuant to Fed. R. Civ. P. 56(a).  ECF No. 77-1.  This motion is fully briefed.  *See* ECF Nos. 77-1, 82, and 83.  No hearing is necessary to resolve this motion.  *See* L.R. 105.6 (D. Md. 2021).  For the reasons that follow, the Court: (1) **GRANTS** Williams Scotsman's motion for summary judgment.  Fed. R. Civ. P. 56(a).

**II.    FACTUAL AND PROCEDURAL BACKGROUND[1]**

    **A.     Factual Background**

    This civil action arises out of the alleged breach of three lease agreements by and between Williams Scotsman and Dryades for the use of modular classroom units for an elementary school.  *See generally*, ECF No. 77-1.  In the amended complaint, Williams

---

[1] The facts recited in this memorandum opinion are taken from the amended complaint; Plaintiff's motion for summary judgment and the memorandum in support thereof; Defendant's response in opposition thereto; and Plaintiff's reply brief and statement of undisputed facts.  ECF Nos. 30, 77-1, 82 and 83.

Scotsman alleges that Dryades breached certain lease agreements for modular classroom units, and for a modular classroom building, by failing to pay the rent for the modular units and refusing to accept delivery of the modular building. *See generally*, ECF No. 30. Specifically, Williams Scotsman asserts a claim for breach of a building lease in Count I of the amended complaint and a claim for breach of certain classroom leases in Count II of the amended complaint. *Id*. As relief, Williams Scotsman seeks to recover monetary damages, attorneys' fees and costs from Dryades. *Id*. at Prayer for Relief.

As background, Plaintiff, Williams Scotsman, is a Maryland corporation with its principal place of business located in Baltimore, Maryland. ECF No. 30 at 1. Williams Scotsman is a leader in the mobile and modular space industry and the company engages in the business of leasing modular buildings, mobile offices, classrooms and storage units. *Id*.

Defendant, Dryades, is a Louisiana non-profit corporation with its principal place of business located in New Orleans, Louisiana. *Id*.

<u>The Classroom Leases</u>

Dryades is the former operator of a charter elementary school complex and an early childhood center located in New Orleans, Louisiana. ECF No. 77-1 at 2. Gregory Phillips is the former chief executive officer of the school. *Id*. at 4.

In 2016, Dryades expressed interest in updating certain buildings located on the school's campus. *Id*. at 3. And so, Dryades contacted Williams Scotsman to discuss obtaining modular classroom units for the school. *Id*.

On or about February 8, 2016, the parties entered into an agreement for the lease of two 68 x 24 modular classroom units, for a minimum lease term of 36 months, at an agreed monthly rent of $1,325.00 per unit, plus applicable taxes and other agreed charges (the "First Classroom Lease"). ECF No. 30 at 3. On or about June 21, 2016, the parties entered into another agreement for the lease of one 40 x 24 modular classroom unit, for a minimum lease term of 36 months, at an agreed monthly rent of $1,076.00, plus applicable taxes and other agreed charges (the "Second Classroom Lease"). *Id*. These leases are collectively referred to herein as the ("Classroom Leases"). It is undisputed that the Classroom Leases were executed on behalf of Dryades by Gregory Phillips, who was Dryades' chief executive officer at the time. ECF No. 77-2, 8:17-21, 11:8-23.

The Classroom Leases contain several provisions that are relevant to this dispute. First, the Classroom Leases contain a rent provision that provides, in relevant part, that:

> Rent for the Equipment begins to accrue upon completion of delivery and set-up, if required, of the Equipment (the "Delivery Date"). Lessee shall pay Lessor, in advance, monthly rent for the Equipment on the due date at the Rate Per Month stated in this Lease Agreement during the Term, and at the Rate Per Month established by Lessor during the Extension Period. Lessee shall be solely liable for any and all (i) sales and use, gross receipts, transaction privilege, value added, goods and services, and similar taxes ("Sales Taxes"), (ii) ad valorem, real property, and personal property taxes ("Property Taxes"), and (iii) related 3rd party fees and expenses ("Fees") (the items set forth in clauses (i), (ii), and (iii), hereinafter referred to as "Taxes and Fees")
>
> Any amounts not paid within twenty (20) days of the sue date set forth on the invoice shall be subject to an interest charge of 1½% per month or the maximum amount permitted by law, whichever is lower, of the amount in arrears for the period such amount remains unpaid plus an administrative late charge of $35.00 per month for each month the invoice remains unpaid.

ECF No. 77-7 at 6-7. Second, the Classroom Leases contain a term of lease provision, which provides that:

> The term of this Lease Agreement begins on the date of delivery of the Equipment and ends on the last day of the Minimum Lease Term ("Term") or the Extension Period (as herein defined). Lessee has no right to cancel or terminate this Lease prior to the Expiration of the Term. Acceptance of Equipment returned to Lessor prior to expiration of the Term or any Extension Period thereof, does not constitute a release of Lessee's rental obligations. In the event Lessee terminates the Lease Agreement during the Term, Lessee unconditionally agrees to pay a termination/cancellation fee equal to the remaining payments for the unfulfilled Term, any applicable charges for services or modifications performed by Lessor to make the Equipment ready for Lessee's use, and any applicable charges related to Ancillary Products, plus the Final Return Charges. At the end of the Term or Extension Period, Lessee shall be responsible for any "Final Return Charges" as estimated in the Lease Order Agreement. Lessee understands and agrees that the Final Return Charges stated in the Lease Order Agreement are estimates only and that Final Return Charges including, but not limited to, dismantle and return freight charges, will be charged at Lessor's then prevailing rate at the time of surrender. Lessor has the right to require Lessee to prepay the rental for the last month and return freight and knockdown charges. Any

3

>amounts prepaid by Lessee for rent or estimated return freight and knockdown shall be applied as a credit to Lessee's final invoice once final charges are determined by Lessor. At the end of the Term, this Lease Agreement is automatically extended on a month-to-month basis on the same terms and conditions until the Equipment is returned to Lessor (the "Extension Period"); except that Lessee's rental rate shall be automatically adjusted to Lessor's then prevailing renewal rental rate. At the end of the Term, Lessor has the right, upon notice to Lessee, to change or increase any other fee due and payable under the Lease Agreement. After the end of the Term, either party can terminate this Lease Agreement on thirty (30) days written notice.

*Id*. at 5.

Third, the Classroom Leases provide that the "Lessee will pay all costs and expenses, including reasonable attorneys' fees, incurred by Lessor in enforcing any terms, covenants, and indemnities provided herein." *Id*. at 7-8.  Lastly, the Classroom Leases provide that "all legal actions arising out of or related to this Lease Agreement shall be filed and conducted exclusively in a state or federal court in Baltimore City, Maryland." *Id*. at 10.

The Building Lease

In November 2016, the facilities manager of Dryades, Delwin Davis, had discussions with Williams Scotsman's sales representative, Lisandra Bourg, about replacing certain modular classroom units at the Dryades school site with a custom-built, eight-classroom building.  ECF No. 77-5, at 65:10-66:8, 69:20-70:16.  These discussions lead to a plan to custom build a 10-classroom building for the school.  *Id*. at 70:17-71:7, 72:1-19.

It is undisputed that, on January 5, 2017, Ms. Bourg sent Mr. Davis a proposed contract for the lease of a custom-built, 10-classroom modular building, for a minimum lease term of 36 months, at a monthly rent of $10,773.00, plus applicable taxes and other charges (the "Building Lease").  *Id*. at 74:3-75:17.  It is also undisputed that Mr. Davis forwarded this proposal to Mr. Phillips on January 5, 2017.  *Id*. at 77:14-78:4.

In addition, it is undisputed that Mr. Phillip's signature appears on the Building Lease on behalf of Dryades.  ECF No. 77-2, at 20:23-21:3, 44:19-24.  Dryades disputes, however, that Mr. Phillips knowingly signed the Building Lease.[2]  ECF No. 77-2, at 20:23-21:3, 44:19-24;

---

[2] The former interim chief executive officer of Dryades, Douglas Evans, acknowledged during a May 15, 2018, Dryades Board of Directors meeting that Mr. Phillips signed the Building Lease.  ECF No. 77-16 at 4-5.

4

ECF No. 77-5, at 80:6-81:11. 17; ECF No. 82 at 2.  But, it is undisputed that Ms. Bourg traveled to the Dryades campus to collect the Building Lease, apparently signed by Mr. Phillips, and to deliver the lease agreement to Williams Scotsman for countersignature.  ECF No. 77-5, at 80:19-81:11.

The Building Lease contains several provisions that are relevant to this dispute.  First, the Building Lease provides that the "Minimum Lease Term" begins on the date of delivery of the equipment.  ECF No. 77-13 at 5.  Second, the Building Lease contains a provision regarding termination of the lease that provides, in relevant part, that:

> In the event Lessee terminates this Lease Agreement or wrongfully rejects Equipment prior to the commencement of the Minimum Lease Term, Lessee shall be responsible for the payment to Lessor of: (a) the costs incurred by Lessor for labor, materials and work executed up to Lessor's receipt of written notice of termination; (b) storage related charges attributable to failed delivery; (c) rent for the Minimum Lease Term; and (d) reasonable overhead and profit.
>
> The term of this Lease Agreement begins on the date of delivery of the Equipment and ends on the last day of the Minimum Lease Term ("Term") or the Extension Period (as herein defined).  Lessee has no right to cancel or terminate this Lease prior to the Expiration of the Term.

*Id*.  The Building Lease also provides that the "Lessee will pay all costs and expenses, including reasonable attorneys' fees, incurred by Lessor in enforcing any terms, covenants, and indemnities provided herein."  *Id*. at 7-8.  Lastly, the Building Lease provides that "all legal actions arising out of or related to this Lease Agreement shall be filed and conducted exclusively in a state or federal court in Baltimore City, Maryland."  *Id*. at 10.

<u>Dryades' Contract With Hewitt-Washington</u>

In January 2017, Dryades contracted with the architectural firm of Hewitt-Washington & Associates, LLC ("Hewitt-Washington") to provide project management services in connection with the installation of a 10-classroom modular building at the school.  ECF No. 77-18, at 18:17:19-5, 19:12-20:8; ECF No. 77-19, at 83:22-84:22.  On March 27-28, 2017, Dryades and Hewitt-Washington exchanged communications regarding the establishment of a timeline for the installation of the 10 modular classrooms.  ECF No. 77-23 at 2-3; ECF No. 77-24 at 2-3.

The project manager at Hewitt-Washington, Leonard Washington, testified during his deposition that Dryades was aware in January 2017 that the school would be leasing a modular building to be installed at the school's campus.  ECF No. 77-3, at 21:24-23:1; *see also* ECF No. 77-5, at 85:20-25, 89:12-17; ECF No. 77-6, at 27:7-16, 30:18-31:15; ECF No. 77-22 at 2; ECF No. 77-5, at 86:1-87:4.  To that end, Hewitt-Washington engaged Huseman & Associates, LLC ("Huseman") as its mechanical and electrical engineering consultant in connection with the installation of the 10-classroom modular building.  ECF No. 77-3, at 20:16-21:4; ECF No. 77-25, at 9:8-11:17, 12:18-13:19.  Hewitt-Washington also engaged Schrenk Endom & Flanagan, LLC ("Schrenk") as its structural engineering consultant in connection with the installation of the 10-classroom modular building.  ECF No. 77-3, at 15:5-23; ECF No. 77-18, at 26:13- 27:16.

It is undisputed that, on or about May 11, 2017, Schrenk produced completed foundation plans for the installation of the 10-classroom modular building.  ECF No. 77-3, at 26:3-15, 26:23-27:3.  Thereafter, Williams Scotsman provided Dryades with final architectural drawings of the 10-classroom modular building to be installed.  *See generally*, ECF No. 77-32.  It is also undisputed that the custom-built, 10-classroom modular building was fully constructed and prepared to be delivered to Dryades in July 2017.  ECF No. 77-6, at 27:7-11, 46:3-12.

But, during the summer of 2017, Dryades decided that it would not move forward with the installation of the 10-classroom modular building, due to financial and regulatory compliance concerns.  ECF No. 77-5, at 92:16- 93:9.  And so, Hewitt-Washington ceased work on the modular classroom building project.  ECF No. 77-3, at 29:17-30:12, 30:20-31:5.

It is undisputed that Dryades refused to accept delivery of the modular 10-classroom building from Williams Scotsman in 2017.  ECF No. 77-6, at 31:2-16, 46:3-12.  It is also undisputed that Dryades stopped paying rent on the leased modular classrooms, pursuant to the Classroom Leases, in July 2019.  *Id*. at 42:13-43:15; ECF No. 77-5, at 54:22-25, 57:15-25, 58:12-22; ECF No. 77-15, at 25:13-24.  And so, on March 2, 2020, Williams Scotsman sent Dryades a notice of default, advising of its intent to repossess the three classroom units leased to Dryades under the Classroom Leases.  ECF No. 30 at ¶ 18.

After Dryades failed to cure this default, Williams Scotsman repossessed the three classroom modular units leased under the Classroom Leases in the summer of 2020.  ECF No. 30 at ¶ 19.  Thereafter, Williams Scotsman sent final invoices to Dryades for the three modular

classroom units leased to Dryades, Unit Nos. CPX-76244, CPX-75479 and CPX-75482. *Id*. at ¶ 20; ECF No. 77-1 at 9.

In this regard, it is undisputed that that: (1) the total amount due for unit CPX-75479 under the Classroom Leases is $30,837.82; (2) the total amount due for unit CPX-75482 under the Classroom Leases is $30,379.92; and (3) the total amount due for unit CPX-76244 under the Classroom Leases is $18,925.07. ECF No. 77-36 at 2. It is also undisputed that the prejudgment interest on the outstanding rent for these units is $39, 878.18 for the period September 9, 2020, through June 15, 2023. *Id*. Lastly, it is undisputed that Dryades has not paid the outstanding invoices for the Classroom Leases. ECF No. 77-5, at 9:20-10:20, 58:20-59:16, 59:20-61:6, 61:13-62:10, 96:12-97:3.

### B. Procedural Background

Williams Scotsman commenced this action on April 3, 2020. ECF No. 1. On February 22, 2021, Williams Scotsman filed an amended complaint by leave of the Court. ECF No. 30.

On March 13, 2023, Williams Scotsman filed a motion for summary judgment and a memorandum in support thereof. ECF Nos. 77 and 77-1. On May 25, 2023, Dryades filed a response in opposition to Williams Scotsman's motion. ECF No. 82. On June 15, 2023, Williams Scotsman filed a reply brief. ECF No. 83.

William Scotsman's motion for summary judgment having been fully briefed, the Court resolves the pending motion.

## III.   LEGAL STANDARDS
### A.   Fed. R. Civ. P. 56

A motion for summary judgment filed pursuant to Fed. R. Civ. P. 56 will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). And so, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co., Inc. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co., Ltd.*, 601 F.2d 139, 141 (4th Cir. 1979).

When ruling on a motion for summary judgment, the Court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v.*

*Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). In this regard, the moving party bears the burden of showing that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Catawba Indian Tribe of S.C. v. State of S.C.*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied,* 507 U.S. 972 (1993). But, a party who bears the burden of proof on a particular claim must also factually support each element of his or her claim. *See Celotex Corp.*, 477 U.S. at 322-23. Given this, "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Id.* at 323. And so, on those issues on which the nonmoving party will have the burden of proof, it is the nonmoving party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 256.

In this regard, the United States Court of Appeals for the Fourth Circuit has held that, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir. 1997). And so, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

      **B.**      **Breach Of Contract Claims And Contract Interpretation**

Under Maryland law, the elements of a breach of contract claim include: (1) a contractual obligation and (2) a material breach of that obligation. *Allstate Ins. Co. v. Warns*, No. 11-1846, 2012 WL 681792, at *10 (D. Md. Feb. 29, 2012) (citing *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001)). And so, Plaintiff must plead that there existed a "contractual obligation, breach, and damages" to state a plausible breach of contract claim. *Class Produce Grp., LLC v. Harleysville Worcester Ins. Co.*, No. 16-3431, 2018 WL 1471682, at *8 (D. Md. Mar. 23, 2018) (citations omitted).

In addition, the United States Court of Appeals for the Fourth Circuit has held that, when interpreting a contract, the first step is to determine whether, as a matter of law, the contract's language is ambiguous or unambiguous on its face. *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993). If the Court determines that the contract is unambiguous on the dispositive issue in the case, the Court may then properly interpret the contract as a matter of law

8

and grant summary judgment, if no interpretive facts are in genuine issue. *Id*. When the Court finds that a contract is ambiguous, the Court may still examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment upon that basis. *Id*. But if the resort to extrinsic evidence leaves genuine issues of fact regarding the contract's proper interpretation, summary judgment is not warranted, and interpretation of the contract is left to the trier of fact. *Id*.

IV.     **ANALYSIS**

Williams Scotsman has moved for summary judgment on its two breach of contract claims, pursuant to Fed. R. Civ. P. 56, upon the grounds that: (1) Dryades validly executed and materially breached the Building Lease, by refusing to accept delivery of a modular building for the school and (2) Dryades materially breached the Classroom Leases, by failing to pay the rent due for the leased modular classroom units. ECF No. 77-1 at 11-13. And so, Williams Scotsman contends that it is entitled to a judgment in the amount of $387,828.00 for the alleged breach of the Building Lease and in the principal amount of $80,142.81, with prejudgment interest in the amount of $39,878.18, for the alleged breach of the Classroom Leases. ECF Nos. 77-1 at 11-12 and 77-36 at 2.

Dryades counters that Williams Scotsman is not entitled to summary judgment on these breach of contract claims, because: (1) the Building Lease is not a valid contract and (2) Williams Scotsman failed to mitigate its damages with regards to the breach of the Classroom Leases. ECF No. 82 at 2, 9-10. And so, Dryades requests that the Court deny Williams Scotsman's dispositive motion. *Id*.

For the reasons that follow, the undisputed material facts in this case show that: (1) the Building Lease is a valid and enforceable contract by an between Dryades and Williams Scotsman; (2) Dryades materially breached the Building Lease, by refusing to accept delivery of the modular classroom building for the school; and (3) Dryades also materially breached the Classroom Leases, by failing to pay the rent required under those leases. Williams Scotsman has also shown that it is entitled to recover $387,828.00 for the breach of the Building Lease and that it is entitled to recover $80,142.81, with prejudgment interest in the amount of 39,878.18, for the breach of the Classroom Leases. And so, the Court GRANTS Williams Scotsman's motion for summary judgment.

### A.     Williams Scotsman Has Shown That Dryades Breached The Building Lease
#### 1.  The Building Lease Is a Valid Contract

As an initial matter, the undisputed material facts in this case show that the Building Lease is a valid contract by and between Dryades and Williams Scotsman. To prevail on its breach of contract claims, Williams Scotsman must establish, among other things, the existence of a "contractual obligation, breach, and damages." *Class Produce Grp., LLC*, 2018 WL 1471682, at *8. And so, Williams Scotsman must first show that it entered into a valid contract with Dryades for the purchase of a modular classroom building, to prevail on its breach of contract claim based upon the Building Lease.

Williams Scotsman has satisfied this burden here. In Count I of the amended complaint, Williams Scotsman alleges that Dryades breached the Building Lease by failing to accept delivery the modular classroom building contemplated by that agreement. ECF No. 30 at 5. While there is no dispute that Dryades failed to accept the building, the parties disagree about whether the Building Lease is a valid contract, and Dryades maintains that this agreement is not a valid contract because its CEO at the time, Gregory Phillips, did not knowingly sign that lease agreement.[3] ECF No. 82 at 9. A plain reading of the Building Lease, which is dated May 15, 2017, makes clear, however, that this agreement contains the signature of Mr. Phillips in his capacity as the President/CEO of Dryades. ECF No. 77-13 at 4. Dryades also acknowledges that Mr. Phillip's signature appears on the Building Lease. ECF No. 77-2, at 20:23-21:3, 44:19-24. And so, the undisputed material facts show that the Building Lease is a valid contract.

The undisputed evidence in this case also corroborates Williams Scotsman's view that the parties entered into a valid contract with regards to the Building Lease. In this regard, it is undisputed that, on the same day that the parties appear to have executed the Building Lease, May 15, 2017, Williams Scotsman's representative, Lisandra Bourg traveled to the Dryades campus to pick up the Building Lease for countersignature. ECF No. 77-5 at 29-30. It is also

---

[3]Dryades argues without persuasion that the Building Lease is not a valid contract, because: (1) Mr. Phillips does not recall signing the Building Lease; (2) there was no record that the board discussed or approved the signing of the Building Lease; (3) Dryades knew that its financial position was precarious; and (4) Williams Scotsman was aware that Dryades was not compliant with post-Katrina building codes and, therefore, was unable to accept any building. ECF No. 82 at 9. But Dryades advances no evidence to support this argument or to rebut the evidence before the Court showing that Mr. Phillips signed the Building Lease contract on behalf of Dryades.

10

undisputed that Dryades contracted with Hewitt-Washington to provide architectural services regarding the Building Lease's 10-classroom modular building on or about May 15, 2017. ECF No. 77-5 at 30-32. Dryades' Facilities Manager, Delwin Davis, also acknowledges that Dryades agreed to enter into the Building Lease. ECF No. 77-16 at 4-5. Given this evidence, the Court is satisfied that the Building Lease is a valid contract by and between Dryades and Williams Scotsman.

### 2. Dryades Breached The Building Lease

The undisputed material facts in this case also show that Dryades breached the Building Lease by refusing to accept delivery of the modular classroom building called for under that agreement. ECF No. 77-13 at 5. It is undisputed that, under the terms of the Building Lease, the parties agreed that Williams Scotsman would custom-build a 10-classroom modular building to lease to Dryades for a minimum term of 36 months and a monthly rent of $10,773.00, plus applicable taxes and other charges. ECF No. 77-13 at 2. In this regard, the Building Lease provides that the lease term would begin on the date that Williams Scotsman delivered the modular building to Dryades, and that Dryades could not wrongfully cancel or reject the modular building prior to the commencement of the minimum lease term, or the date that the modular building is to be delivered. *Id*. at 5. And so, the Court reads the plain language of the Building Lease to prohibit Dryades from "wrongfully" cancelling or rejecting the 10-classroom modular building called for under that agreement, prior to the commencement of the minimum lease term.

In this case, there is no dispute between the parties that Dryades did not accept the modular building when Williams Scotsman planned to deliver the building to the school in July 2017. ECF Nos. 77-6, at 27:7-11, 46:3-12; 77-13 at 5. In addition, Dryades appears to acknowledge that its refusal to accept the modular building constitutes a breach of the Building Lease. ECF No. 77-2, at 20:23-21:3, 44:19-24; ECF No. 77-5, at 80:6-81:11. 17; ECF No. 82 at 2. More importantly, Dryades fails to put forward any evidence to show that it did not wrongfully reject the modular building. *See generally*, ECF No. 82. Given this, the unrebutted evidence before the Court shows that Dryades breached the Building Lease, by refusing to accept delivery of the modular building called for under that agreement before the commencement of the Building Lease's minimum lease term.

11

### 3. Williams Scotsman Is Entitled To Recover Damages For The Breach Of The Building Lease

Having determined that Dryades breached the Building Lease, by refusing to accept delivery of the modular building constructed for the school, the Court next considers whether Williams Scotsman has shown that it is entitled to recover the damages that it seeks for this breach. In this regard, Williams Scotsman seeks to recover monetary damages in the amount of $387,828.00 from Dryades. ECF Nos. 77-1 at 11-12 and 77-36 at 2. Williams Scotsman has shown that it is entitled to recover these damages for several reasons.

First, the plain language of the Building Lease allows Williams Scotsman to recover these damages. Section 3 of the Building Lease addresses the damages that a party may recover for a breach of that agreement and this provision provides, in relevant part, that:

> In the event Lessee terminates this Lease Agreement or wrongfully rejects Equipment prior to the commencement of the Minimum Lease Term, Lessee shall be responsible for the payment to Lessor of: (a) the costs incurred by Lessor for labor, materials and work executed up to Lessor's receipt of written notice of termination; (b) storage related charges attributable to failed delivery; (c) *rent for the Minimum Lease Term*; and (d) reasonable overhead and profit.

ECF No. 77-13 at 5. Section 5 of the Building Lease further provides that the Minimum Lease Term begins on the date the equipment is delivered to the school. *Id*. And so, the Court reads the Building Lease to allow Williams Scotsman to recover, among other things, the amount of the rent for the modular building during the *"*Minimum Lease Term," if Dryades breaches this agreement.

The Building Lease also makes clear that the "Minimum Lease Term" is 36 months, and that the rent for the modular building during this term would be $10,773.00 per month. ECF No. 77-5, at 74:3-75:17. And so, as Williams Scotsman correctly observes, the total rent due under the Building Lease for the minimum lease term (36 months x $10,773.00) is $387,828.00.

While Dryades argues that Williams Scotsman is not entitled to recover these damages, it neither disputes the aforementioned calculation of damages, nor advances any argument to show that these damages should not be awarded in this case. *See generally*, ECF No. 82. And so, the Court GRANTS Williams Scotsman's motion for summary judgment on its breach of

contract claim set forth in Count I of the amended complaint and enters judgment in favor of Williams Scotsman in the amount of $387,828.00 for the breach of the Building Lease.

### B. The Undisputed Material Facts Show That Dryades Breached The Classroom Leases

Turning to Williams Scotsman's remaining breach of contract claim involving the Classroom Leases, the undisputed material facts in this case also show that Dryades breached these leases, by failing to pay rent on the modular classrooms during the period July 2019 until Williams Scotsman re-possessed these units in the summer of 2020. It is undisputed that Dryades and Williams Scotsman entered into two lease agreements for the lease of modular classrooms on February 8, 2016, and June 21, 2016, respectively. ECF No. 77-7 at 4 and ECF No. 77-8 at 4. The parties also agree that Dryades breached the Classroom Leases by failing to pay the rent required under the leases after July 2019. ECF No. 77-5, at 54:22-25, 57:15-25, 58:12-22; ECF No. 77-15, at 25:13-24.

In this regard, the terms of the Classroom Leases make clear that Dryades agreed to lease two 68 x 24 modular classroom units, for a minimum lease term of 36 months, at a monthly rent of $1,325, and to lease one 40 x 24 modular classroom unit for a minimum lease term of 36 months, at a monthly rent of $1,076.00. ECF Nos. 77-8 at 2; ECF No. 77-7 at 2. There is also no dispute that the Classroom Leases became month-to-month leases for as long as Dryades maintained possession of the modular classroom units, after the minimum lease term expired. ECF No. 77-13 at 5. Given these undisputed material facts, there can be no dispute that Dryades materially breached the Classroom Leases by failing to pay rent during the period July 2019 until the summer of 2020, when Williams Scotsman repossessed the modular classroom units. ECF No. 30 at ¶ 19.

The remaining question before the Court is the amount of damages that Williams Scotsman may recover for Dryades' breaches of the Classroom Leases. In this regard, Williams Scotsman argues that it is entitled to recover damages in the principal amount of $80,142.81, for unpaid rent, with prejudgment interest in the amount of $39,878.18, for the period of July 2019, to June 15, 2023, for Dryades' breaches of the Classroom Leases. ECF Nos. 77-1 at 11-12 and 77-36 at 2. This damages figure is comprised of the unpaid rent for the modular classrooms leased under the Classroom Leases, during the period July 2019, to the summer of 2020, and the

interest accrued on the amount outstanding on certain unpaid invoices associated with these units. *Id*.[4]

Notably, the parties do not dispute that the amount of unpaid rent under the Classroom Leases is $80,142.81. ECF No. 82 at 2; ECF No. 83 at 7. A plain reading of the Classroom Leases also shows that Williams Scotsman may recover pre-judgment interest. ECF No. 77-7 at 6-7.

As Williams Scotsman correctly observes, the Classroom Leases allow for the recovery of pre-judgment interest, at the rate of 18% per annum, for the amounts charged in its outstanding invoices. ECF No. 83 at 7. Specifically, Section 9 of the Classroom Leases provides, in relevant part, that:

> Rent for the Equipment begins to accrue upon completion of delivery and set-up, if required, of the Equipment (the "Delivery Date"). Lessee shall pay Lessor, in advance, monthly rent for the Equipment on the due date at the Rate Per Month stated in this Lease Agreement during the Term, and at the Rate Per Month established by Lessor during the Extension Period. Lessee shall be solely liable for any and all (i) sales and use, gross receipts, transaction privilege, value added, goods and services, and similar taxes ("Sales Taxes"), (ii) ad valorem, real property, and personal property taxes ("Property Taxes"), and (iii) related 3rd party fees and expenses ("Fees") (the items set forth in clauses (i), (ii), and (iii), hereinafter referred to as "Taxes and Fees")
>
> Any amounts not paid within twenty (20) days of the sue date set forth on the invoice shall be subject to an interest charge of 1½% per month or the maximum amount permitted by law, whichever is lower, of the amount in arrears for the period such amount remains unpaid plus an administrative late charge of $35.00 per month for each month the invoice remains unpaid.

---

[4] It is undisputed that the unpaid rent for the three modular classroom units (CPX-76244, CPX-75479, and CPX-75482) is: (1) $30,837.82 for unit CPX-75479; (2) $30,379.92 for unit CPX-75482; (3) and $18,925.07 for unit CPX-76244. ECF No. 77-36 at 2; ECF No. 82 at 2. It is also undisputed that the prejudgment interest is $39,878.18. ECF No. 77-37 at 2; ECF No. 82 at 2. To support its damages claim, Williams Scotsman has provided the Court with copies of the final invoices for the modular classrooms leased under the Classroom Leases and a calculation of the unpaid rent for the three modular classrooms. ECF No. 77-36 at 2. The invoices contain charges for, among other things, "final rent," "complex removal" and property tax recovery. *Id*.

ECF No. 77-7 at 6-7.  And so, Williams Scotsman appropriately seeks to recover pre-judgment interest in the amount of $39,878.18 for the period of July 2019 to June 15, 2023.  ECF No. 83 at 7.

Dryades, nonetheless, argues that Williams Scotsman is not entitled to recover these damages, because Williams Scotsman failed to mitigate its damages.  *See generally*, ECF No. 82.  But, Dryades neither puts forward any evidence to show that Williams Scotsman failed to mitigate damages, nor provides an alternative damages amount in this case.  *See generally*, ECF No. 82.

Because the undisputed material facts show that Williams Scotsman is entitled to recover damages in the principal amount of $80,142.81, and prejudgment interest in the amount of $39,878.18, for Dryades' breaches of the Classroom Leases, the Court GRANTS Williams Scotsman's motion for summary judgment on its breach of contract claim set forth in Count II of the amended complaint and awards damages to Williams Scotsman in the principal amount of $80,142.81 and prejudgment interest in the amount of $39,878.18, for the period of July 2019 to June 15, 2023.

## V.   CONCLUSION

In sum, the undisputed material facts in this case show that the Building Lease is a valid contract by and between the parties to this action and that Dryades materially breached the Building Lease by refusing to accept delivery of the modular building.  The undisputed material facts also show that Dryades materially breached the Classroom Leases by failing to pay the rent due under these leases.

In addition, Williams Scotsman has shown that it is entitled to recover the damages that it seeks for the breaches of these contracts.  And so, for the foregoing reasons, the Court:

1. **GRANTS** William Scotsman's motion for summary judgment as to Counts I and II of the amended complaint;

2. **ENTERS JUDGMENT** in favor of Williams Scotsman as to Count I of the amended complaint in the amount of $387,828.00; and

3. **ENTERS JUDGMENT** in favor of Williams Scotsman as to Count II of the amended complaint in the principal amount of $80,142.81, with the prejudgment interest in the amount of **$39,878.18**, for the period of July 2019 to June 15, 2023.

**IT IS SO ORDERED.**

s/Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
United States District Judge
